**NORTHWESTERN NATIONAL INSUR-ANCE COMPANY, a Wisconsin corporation, Plaintiff-Appellant,**

v.

**DADE COUNTY, a political subdivision of State of Florida, Defendant-Appellee.**

**No. 71–2602.**

United States Court of Appeals, Fifth Circuit.

June 19, 1972.

William M. Hoeveler, Knight, Peters, Hoeveler, Pickle, Niemoller & Flynn, Miami, Fla., for defendant-appellee.

Before PHILLIPS,* THORNBERRY and RONEY, Circuit Judges.

PHILLIPS, Circuit Judge:

Northwestern National Insurance Company, hereinafter referred to as the Insurance Company, brought this action against Dade County, Florida, hereinafter referred to as the County, alleging in its complaint that it had paid to two of its insured sums aggregating $24,-651.68 for losses suffered by them and covered by the insurance policy issued by it to them; that the negligence of the County was the proximate cause of such losses, and that it was entitled as the subrogee of its insured to recover such amount from the County.

From a summary judgment entered in favor of the County, the Insurance Company has appealed.

In its complaint, after setting out the jurisdictional facts, the Insurance Company alleged the following facts:

At all times mentioned in the complaint, Bernard J. Smith owned the charter fishing vessel, Angler IV, and A. F. Kappler owned the charter fishing vessel, Hi Ho, and each of such vessels was docked at a berth furnished to her respective owner by the County at its marina and docks at Haulover Beach in Dade County, Florida, in return for monthly rentals paid the County by the respective owners of such vessels.

On January 22, 1970, at about 9:30 p. m., while such vessels were docked in such berths, a fire in Angler IV was seen by bystanders, who immediately ran to the fire hose shed maintained at the head of the pier by the County, attached the fire hose provided by the County, and attempted to extinguish the fire, but the hose was so deteriorated and full of holes that no water reached the nozzle of the hose, and the hose was of no use in extinguishing the fire.

Linwood Anderson, Smathers & Thompson, Miami, Fla., for plaintiff-appellant.

* Of the Tenth Circuit, sitting by designation.

Before other means of fighting the fire were obtained, the fire, which could have been extinguished had the hose not been defective, was out of control, and completely destroyed the Angler IV and severely damaged the Hi Ho.

The loss of the Angler IV and the damage to the Hi Ho were caused by the negligence of the County in furnishing the defective fire fighting equipment, in failing to furnish adequate and proper fire fighting equipment, and in failing to maintain fire fighting equipment at the pier.

The Insurance Company had issued policies of marine hull insurance to Smith, insuring the Angler IV, and to Kappler, insuring the Hi Ho, against marine perils, including fire. Such policies were in force at the time of the fire, and the Insurance Company became liable to pay and did pay under its policy to Smith the amount of $18,904 and to Kappler the amount of $5,747.68 for the respective losses they sustained because of the fire. And the Insurance Company asserted in its complaint that by reason of such payments it became subrogated to all the rights of its insured against the County arising from such fire and damage to the full extent of the payments made.

In an amendment to its answer, the County set up as an affirmative defense that by the provisions of a lease entered into between it and Smith, dated August 25, 1969, leasing space to Smith in which to dock his boat, Angler IV, at the County marina at Haulover Beach, Florida, and a lease dated August 20, 1969, leasing space to Kappler in which to dock his boat, Hi Ho, at such marina, Smith and Kappler were each barred from asserting against the County claims for negligence, and the Insurance Company was likewise barred from asserting claims, as their subrogee, against the County.

The leases were identical, except as to their dates, the names of the lessees, and the names of their respective boats.

In its brief, the County relies on the provisions of paragraph 5 of the leases, which reads:

"5. All personal property placed or moved in or on the premises or upon the vessel above described shall be at the risk of the lessee or owner thereof, and lessor shall not be liable for any damage or loss to said personal property or the boat for any act of negligence of any co-lessee or occupant, or any other person whomsoever."

and also on the provisions of paragraphs 12, 13, and 14, which we set out in note 1 hereto.[1]

---

1. Paragraphs 12, 13, and 14 of the leases read:

"12. It is expressly agreed and understood by and between the parties to this agreement, that the lessor shall not be liable for any damage, loss or injury which may be sustained by the lessee or other person or for any other damage, loss or injury resulting from the carelessness, negligence, or improper conduct on the part of any other lessee or agents, or employees in or on or about the said docks and premises.

"13. The lessee does hereby forever release and discharge the lessor, its departments, agencies, agents and authorized personnel from any and all liability that has or may result from or be suffered by the lessee arising out of or in connection with this contract, and the lessee's operation hereunder.

"14. The lessee shall defend, pay or settle any and all liability, demands and claims by or in favor of any third person including, but not limited to, the lessee's agents, servants or employees, against the lessor, its departments, agencies and authorized personnel arising out of, or in connection with this contract or the lessee's operation hereunder, and to forever hold harmless the lessor, its departments, agencies, agents and personnel from any such liabilities, demands or claims asserted by any of the afore-described, including cost of suit, attorney's fees, and any other expenses in connection therewith, and to pay or settle any claims for injury, loss or damage to personnel or property of or under the control of the lessor arising out of this contract or the lessee's operation hereunder."

The motion for summary judgment was filed on May 27, 1971. The summary judgment was filed on June 15, 1971. The deposition of Bernard Smith was taken on May 14, 1971, and is set out in full in the appendix. While the deposition does not show that it was filed in the District Court, counsel for the Insurance Company referred to it in their brief in chief, and counsel for the County take no exception to their so referring. We therefore assume that it was before the District Court when it considered and passed on the motion for summary judgment.

In their briefs, both parties regard and treat the provisions of the leases on which the County bases its claim of non-liability as indemnity agreements, and cite and rely on cases invoking the question of whether the provisions of an indemnity agreement indemnify against the indemnitee's own negligence.

In his deposition, Smith testified that the County drafted his lease; that he had no choice as to its terms, and that it was presented to him to accept as drafted, or vacate his space. It is fairly inferable from his testimony that there were no negotiations between him and the County as to the terms and provisions which were incorporated in his lease. Such facts are also fairly inferable from the testimony given by Jacob Wolf in a deposition taken on behalf of the County on May 14, 1971. Wolf testified that he was familiar with the leases entered into by the County for docking space at its marina; that he had had occasion to handle some of them; and that all of the leases entered into by the County for docking space at piers in its marina were prepared by the County and were identical in language.

The general rule followed in a large majority of the jurisdictions of the United States is that a contract of indemnity will not be construed to indemni-fy the indemnitee against liability for his own negligence, unless the intention of the parties so to do is expressed in clear, unequivocal, and specific language, and that general language, although broad in scope, is not sufficient.[2] That rule is referred to in the judicial decisions and by text writers as the majority rule.

The courts in some jurisdictions follow what is referred to as the minority rule and do not adhere to the strict requirements of the majority rule.

Since Florida law is controlling, our problem is to ascertain and apply the law of Florida. After a careful examination of the Florida decisions, for reasons we shall hereafter more fully state, we have concluded that the law of Florida is in accord with the majority rule.

We are of the opinion that Gulf Oil Corporation v. Atlantic Coast Line Railroad Co., Fla.Dist.Ct.App., 2nd Dist., 196 So.2d 456, is the leading Florida case on the subject. In its opinion in that case, the court reviewed all of the decisions of the Florida courts, from the decision of the Supreme Court of Florida in Jackson v. Florida Weathermakers, 55 So.2d 575, down to the date of its decision in the Gulf Oil Corporation case.

In Jackson v. Florida Weathermakers, supra, two individuals, doing business as Jacksonville Meat Company, owned and operated a grocery store in Jacksonville, Florida. Jacksonville Meat Company entered into a contract with Florida Weathermakers, Inc., for installation by the latter of an air conditioning system in the store. Weathermakers subcontracted the electrical wiring part of the job to H. L. Hall. At a time when Hall's employees were engaged in running the wiring system through the attic of the store, a celotex tile fell from the ceiling of the store and struck and injured Nellie B. Creasy while she was shopping in the store. Mrs. Creasy and her husband brought a suit against Jacksonville

2. Gulf Oil Corporation v. Atlantic Coast Line Railroad Co., Fla.Dist.Ct.App., 2d Dist., 196 So.2d 456, 458, 459; United States v. Seckinger, 5 Cir., 408 F.2d 146, 150, 151, and note 10 thereto at page 151; 41 Am.Jur.2d, Indemnity, § 15, p. 701 (1968).

Meat Company, Weathermakers, and Hall to recover damages for her injuries. Jacksonville Meat Company filed a cross-complaint against Weathermakers and Hall, alleging that the injuries suffered by Mrs. Creasy were caused solely by the negligence of Weathermakers and Hall, and by virtue of the contract between Jacksonville Meat Company and Weathermakers, which contained a public liability clause, one or both of the other defendants were liable over to Jacksonville Meat Company for all damages awarded against it in the Creasy suit. A jury trial resulted in a verdict in favor of Weathermakers and Hall and against Jacksonville Meat Company, and assessed damages against Jacksonville Meat Company and in favor of Creasy.

In an opinion on rehearing, the Supreme Court of Florida said:

"The cross-claim against Florida Weathermakers was bottomed solely on the contract between Jax Meat and Florida Weathermakers whereby Florida Weathermakers agreed to procure 'public liability insurance,' which in the absence of clear and unequivocal terms must be construed to be a contract to indemnify only against the negligence of the indemnitor, and not that of the indemnitee. 27 Am.Jur., Indemnity, Section 15 * * *. Since Florida Weathermakers and its subcontractor were exonerated by the verdict of the jury, it is no longer important whether or not Florida Weathermakers procured such 'public liability insurance.'"

In the Gulf Oil Corporation case, the District Court of Appeals for the Second District of Florida said:

"The case of Nat Harrison Associates, Inc. v. Fla. Power & Light Co., 162 So.2d 298 (D.C.A.Fla.1964), cert. denied, 166 So.2d 754 (Fla.1964), involved construction of the following contractual clause:

"' * * * Contractor, upon acceptance of this purchase order, agrees to protect, defend and hold the Company free and unharmed against any liabilities whatsoever resulting in connection with performance of the described work by Contractor or its employees.'

In holding that the clause did not amount to an agreement by appellant to indemnify the appellee against its own negligence, the court stated:

"'It is the general principle of law that contracts of indemnification which attempt to relieve a party of its own negligence are not looked upon with favor. * * *

In order for such a contract to be so construed, *it must be clear and unequivocal.* See: Jackson v. Florida Weathermakers, Fla.1951, 55 So. 2d 575 * * *.'

"In the recent case of Fla. Power & Light Co. v. Elmore, 189 So.2d 522 (D. C.A.Fla.1966), the court stated:

"'The indemnity contract as contained in the purchase order was as follows:

"'" Contractor, [Sunshine Contractors, Incorporated] upon acceptance of this purchase order, agrees to hold the Company free and unharmed against any liabilities whatsoever resulting in connection with performance of the described work by Contractor or its employees."

"'The trial court was eminently correct in holding that the contract did not indemnify the indemnitee against losses resulting from its own negligence, and in so holding followed the law as established by the Supreme Court in Jackson v. Florida Weathermakers, Fla.1952, 55 So.2d 575, on rehearing at p. 579, * * *.

"'In the Jackson case the Supreme Court held that *"in the absence of clear and unequivocal terms* [an indemnity contract] must be construed to be a contract to indemnify only against the negligence of the indemnitor, and not that of the indemnitee,"* citing 27 Am.Jur., Indemnity, § 15 and the Annotation in 175 A.L. R., Division IV, Subdivision B (§ 17, p. 29) where the rule is so stated,

*with the addition that intent to indemnify the indemnitee against his own negligence will not be inferred from general language,* and that such contracts are to be strictly construed. \* \* \* '

"It is evident, then, that Florida decisions hold that an indemnity agreement which indemnifies against the indemnitee's own negligence must state this in 'clear and unequivocal' language. It is also clear that in Nat Harrison Associates, Inc. v. Fla. Power & Light Co. \* \* \* and Fla. Power & Light Co. v. Elmore, supra, the court ruled that the words 'against any liabilities whatsoever' did not constitute 'clear and unequivocal' language sufficient to indemnify the indemnitee against its own negligence. The language of the Elmore decision indicates that the court adopted the majority rule that there can be no presumption that an indemnitor meant to assume liability for an indemnitee's negligence unless there is explicit reference to the indemnitee's negligence in the contract. We likewise conclude that in order for an indemnity clause or contract to indemnify against an indemnitee's own negligence, the clause or contract must expressly state that such liability is undertaken by the indemnitor.

"Thus it would appear that the majority rule is the better, and that in order for one to indemnify against indemnitee's own negligence general language will not suffice. The term clear and unequivocal goes to the specific indemnification; \* \* \* there must be language specifically designating indemnification against one's own negligence."

An application to the Florida Supreme Court to review the decision in Gulf Oil Corporation v. Atlantic Coast Line Railroad Company, supra, was denied. See 201 So.2d 893.

In the case of Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 296 F.2d 256, cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18, this court held the majority rule was not the law of Florida. In the Gulf Oil Corporation case, the court noted the decision in the Jacksonville Terminal Company case, but refused to follow it. And this court, in United States v. Seckinger, 5 Cir., 408 F. 2d 146, held that the Jacksonville Terminal Company case was no longer a correct pronouncement of the law of Florida. See 408 F.2d 150, note 10. In such note 10, the court said:

"In Gulf Oil Corp. v. Atlantic Coast Line R. R., Fla.Dist.Ct.App., 1967, 196 So.2d 456, cert. denied, Fla., 1967, 201 So.2d 893, the Florida District Court of Appeal expressly declined to follow *Jacksonville* stating that there were strong indications since *Jacksonville* that Florida Courts would adopt the majority rule. After analyzing *Jacksonville,* the Florida cases, and rejecting it and the idea that a clause reading essentially the same as that in *Jacksonville* was adequate, the *Gulf* Court concluded: 'It is evident, then, that Florida decisions hold that an indemnity agreement which indemnifies against the indemnitee's own negligence must state this in "clear and unequivocal" language.'

" ' \* \* \* there must be language *specifically* designating indemnification against one's own negligence.' 196 So.2d at 459. (Emphasis in original.)

"This authoritative choice by a Florida Court of Appeal bears the stamp of approval evidenced by the denial of certiorari by the Florida Supreme Court. Unlike the equivocal counterpart in the Federal system, denial of certiorari stands for much in Florida. As we said in Miami Parts & Spring, Inc. v. Champion Spark Plug Co., 5 Cir., 1966, 364 F.2d 957, 965–966, n. 7, quoting Hunter v. Tyner, 1942, 151 Fla. 707, 10 So.2d 492: 'A writ of [certiorari] being simply a method of procedure by which such appeals authorized by the statute can be brought to this court, its denial, we think, was an adjudication of the propriety of the order involved \* \* \*.'

\* \* \* \* \* \*

"We are not unmindful of a later Florida Appellate decision purporting to adopt the minority rule, Thomas Awning & Tent Co. v. Toby's Twelfth Cafeteria, Inc., Fla.Dist.Ct.App., 1967, 204 So.2d 756, where one Judge dissented on the basis of *Gulf, supra.* However, by direct communication with the Clerk of the Florida Supreme Court we are advised that certiorari was not applied for in that case. It is therefore our *Erie* judgment that the majority rule adopted for Florida in *Gulf, supra,* stands as the latest authoritative pronouncement of Florida Law."

Counsel for the County cite and rely on the decision of the Florida District Court of Appeal in Thomas Awning & Tent ·Co. v. Toby's Twelfth Cafeteria, Inc., 204 So.2d 756 (1967), as the last pronouncement of a Florida court on the question here involved, and which followed the minority rule. However, this court, in United States v. Seckinger, supra (1969), after the decision in the Thomas Awning & Tent Company case, because certiorari was denied by the Supreme Court of Florida in the Gulf Oil Corporation case, and there was no application for certiorari to the Supreme Court of Florida in the Thomas Awning & Tent Company case, held that the decision in the Gulf Oil Corporation case stood as the latest authoritative pronouncement of Florida law on the question.

We are in full agreement with *Seckinger* and continue to hold that the opinion of the Florida Court of Appeal in the Gulf Oil Corporation case stands as the latest authoritative pronouncement of Florida law, and that the majority rule as stated therein, is the law of Florida.

We think it is clear that the provisions of paragraphs 12, 13, and 14 would not absolve or release the County from liability for its own negligence un-

der the provisions of the majority rule, and counsel for appellee virtually admit that in their brief. They only rely on those paragraphs if the minority rule is applied. Counsel for the County contend, however, that paragraph 5 meets the requirements of the majority rule. We disagree, and hold that paragraph 5 does not meet the requirements of the majority rule, as laid down in the Gulf Oil Corporation case, because it does not by clear, unequivocal, and specific language release the County from liability to the lessees for the County's own negligence. True, the phrase in the last clause of paragraph 5 reading, "or any other person whomsoever" is broad, but nevertheless it is general language and does not meet the requirements of the majority rule, as laid down in the Gulf Oil Corporation case, that the intention to release the indemnitee for his own negligence must be expressed in clear, unequivocal, and specific language, and that general language will not suffice to manifest that intent.

Under *Erie,*[3] we are bound to follow the law of Florida. But were we free to exercise an independent judgment, we would reach the same result, for reasons we will now undertake to state.

In paragraph 5, relied on by the County, the general clause follows the enumeration by definite and specific language of particular classes of persons, to wit, "co-lessee" and "occupant."

Under the rule of ejusdem generis,[4] where general words follow a provision which definitely and specifically describes and enumerates matters, things, or persons of a particular class, the general words should be restricted in application to matters, things, or persons of the same class, which are of the same kind as those that are particularly described and enumerated in the words that precede such general words, unless a contrary intent is clearly expressed,[5]

3. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

4. The rule of ejusdem generis is recognized and followed by the Florida courts.

Mohasco Industries, Inc. v. Maxwell Company, 5 Cir., 425 F.2d 436, 438.

5. 17 Am.Jur.2d, Contracts, § 270, p. 678 (1964).

and we find no manifest contrary intent in the language of the leases here involved.

Here, the word "lessor" is not of the same kind or class as a "co-lessee" or "occupant." In fact, since the lessor is the owner, the term "lessor" is the opposite of the terms "co-lessee" and "occupant."

Moreover, and of perhaps more significance is the fact that all of the leases entered into by the County of docking space at piers in its marina were in precisely the same language, except the name of the lessee, the name of his vessel, the description of the space leased, and the date and term of the lease.

It is obvious that the County had prepared a standard form of lease and followed its exact language, except on the particulars above noted, in all the leases it entered into for the use of docking space at piers in its marina. And it clearly appears that neither of the leases entered into with Smith and Kappler was the result of negotiations between the County and the lessee named therein; that neither Smith nor Kappler had any voice whatever with respect to the recitals, provisions, and terms of the lease to him; and that the County tendered to each of them a lease running to him, drafted by the County, to accept as drawn or to reject and vacate the space occupied by him.

Under the existing facts and circumstances recited above, it would be manifestly unjust to Smith and Kappler to hold that paragraph 5 of their respective leases, or the general language in the last clause thereof, released the County for liability to them for its own negligence.

The case is remanded, with instructions to the trial court to vacate its summary judgment entered in favor of the County and proceed to trial upon the issues presented by the complaint of the Insurance Company and the answer of the County, in accordance with the principles herein enunciated.